# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | | |
|---|---|---|
| **EMILIO GUTIERREZ-SOTO and**<br>**OSCAR GUTIERREZ-SOTO,** | § <br> § <br> § | |
| *Petitioners,* | § <br> § | |
| **v.** | § <br> § | **EP-18-CV-00071-DCG** |
| **JEFFERSON SESSIONS III,** *in his official*<br>*capacity as Attorney General of the United*<br>*States;* **KIRSTJEN NIELSEN,** *in her*<br>*official capacity as Secretary of U.S.*<br>*Department of Homeland Security;*<br>**THOMAS HOMAN,** *in his official capacity*<br>*as Director of U.S. Immigrations and*<br>*Customs Enforcement;* **WILLIAM JOYCE,**<br>*in his official capacity as Acting El Paso*<br>*Field Office Director for U.S. Immigration*<br>*and Customs Enforcement;* **and UNITED**<br>**STATES DEPARTMENT OF**<br>**HOMELAND SECURITY,** | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § | |
| *Respondents.* | § | |

## ORDER

Presently before the Court is Respondents Jefferson Sessions III, Kirstjen Nielsen,

Thomas Homan, William Joyce, and United States Department of Homeland Security's "Motion

to Dismiss, or in the Alternative, Motion for Summary Judgment" ("Motion") (ECF No. 22) filed

on April 24, 2018. Therein, Respondents argue that the Court lacks jurisdiction over this matter

and that Petitioners' constitutional and statutory claims are meritless. Mot. at 5–20. For the

reasons that follow, the Court **GRANTS IN PART AND DENIES IN PART** Respondents'

Motion.

## I.  BACKGROUND

Petitioners Emilio Gutierrez-Soto ("Mr. Gutierrez-Soto") and Oscar Gutierrez-Soto, Mr. Gutierrez-Soto's son, are citizens of Mexico who are currently being detained by Respondents in El Paso, Texas.[1] Respondent Jefferson Sessions III ("Sessions") is the United States Attorney General.[2] Respondent Kirstjen Nielsen ("Nielsen") is the Secretary of the United States Department of Homeland Security ("DHS").[3] Respondent Thomas Homan ("Homan") is the Director of United States Immigration and Customs Enforcement ("ICE").[4] William Joyce ("Joyce") is the Acting El Paso Field Office Director for ICE.[5]

The circumstances that led Petitioners to the United States began with Mr. Gutierrez-Soto reporting on the misdeeds of the Mexican military while he worked as a reporter in Ciudad Juarez, Chihuahua, Mexico.[6] After Mr. Gutierrez-Soto reported that members of the Mexican military committed a series of violent armed robberies in 2005, he was summoned to a location in Ciudad Juarez and threatened by members of the military.[7] However, Mr. Gutierrez-Soto persisted in defying the Mexican military by penning an article detailing the threats he received; in response, the military raided his home and made more threats against his person and his

---

[1] Resp.'s Proposed Undisputed Facts ¶ 2, ECF No. 23 [hereinafter, "Resp.'s PUF"]; Writ, Ex. 3 ¶ 4, ECF No. 1-2.

[2] Writ at 2, ECF No. 1.

[3] *Id.* at 3.

[4] *Id.*

[5] *Id.*

[6] *See* Writ, Ex. 2 at 1.

[7] *Id.*

family.[8] The two events that finally convinced Mr. Gutierrez-Soto to flee Mexico were him noticing that he was being followed by persons he believed to be affiliated with the Mexican military and a friend warning him that the military intended to kill him.[9]

Thus, Petitioners presented themselves at the United States border and applied for admission on June 16, 2008.[10] Nevertheless, Petitioners were deemed inadmissible because they did not have valid entry documents.[11] Subsequently, after being processed for expedited removal, Petitioners claimed fear of returning to Mexico and were interviewed by an asylum officer on June 19.[12] The asylum officer found that Petitioners had a credible fear of persecution, so Petitioners were placed in detention until a decision could be made on whether to parole them.[13] After spending months in detention,[14] Petitioners were paroled as arriving aliens with a credible fear of persecution.[15]

Due to Petitioners not having valid entry documents when they appeared at the border, they were placed in removal proceedings and charged as inadmissible under the Immigration and Nationality Act.[16] In accordance with their status as parolees, though, Petitioners were placed on

---

[8] *Id.* at 2.

[9] *Id.*

[10] Resp.'s PUF ¶ 1.

[11] *Id.* ¶ 5.

[12] *Id.* ¶ 6.

[13] *Id.* ¶¶ 7–8.

[14] Oscar Gutierrez-Soto was detained for two months prior to being paroled, while Mr. Gutierrez-Soto was detained for seven months prior to being paroled. *Id.* ¶ 8.

[15] *Id.* ¶¶ 8–9.

[16] *Id.* ¶ 11.

the non-detained docket, and their hearing before an immigration judge was originally set for January 21, 2011.[17] However, due to a series of delays, Petitioners' hearings were reset a number of times and finally occurred in November and December of 2016.[18] On July 19, 2017, the immigration judge issued his order denying Petitioners' applications for asylum and ordered them removed.[19] On August 21, Petitioners appealed the immigration judge's decision to the Board of Immigration Appeals (the "BIA"), but the BIA dismissed the appeal as untimely on November 2.[20]

Following the dismissal of their appeal, Petitioners filed an emergency motion to stay removal with the immigration judge, which was denied on November 17.[21] Petitioners also filed a request for a stay of removal with ICE, which was denied on December 7.[22] On that same day, Petitioners reported to their previously scheduled meeting with ICE and were taken into custody.[23] After being taken into custody on December 7, ICE placed Petitioners in a vehicle and proceeded towards the El Paso/Juarez border.[24] However, before Petitioners could be deported that day, the BIA granted them a stay pending consideration of their motion to reopen filed on

---

[17] *Id.* ¶ 14.

[18] *Id.* ¶¶ 15–18.

[19] *Id.* ¶¶ 18–19.

[20] *Id.* ¶¶ 20, 22.

[21] *Id.* ¶¶ 24–25.

[22] *Id.* ¶¶ 26, 28.

[23] *Id.* ¶¶ 22, 28.

[24] Writ, Ex. 3 ¶ 3.

November 20.[25] On December 22, the BIA granted Petitioners' motion to reopen and reinstated their appeal.[26]

Nevertheless, despite the reinstatement of their appeal, Petitioners have remained in detention since ICE took them into custody on December 7, 2017.[27] On March 6, 2018, Petitioners filed the instant habeas petition asserting the following: 1) a Substantive Due Process claim under the Fifth Amendment to the United States Constitution, 2) a Procedural Due Process claim under the Fifth Amendment to the United States Constitution, 3) an Equal Protection claim under the Fifth and Fourteenth Amendments to the United States Constitution, 4) a Freedom of the Press claim under the First Amendment to the United States Constitution, 5) a Freedom of Speech claim under the First Amendment to the United States Constitution, and 6) a claim under the Administrative Procedures Act ("APA").[28] Subsequent to filing their habeas petition, Petitioners received some good news. On April 17, the University of Michigan invited Mr. Gutierrez-Soto to join the Knight-Wallace Fellowship class of 2018-19, an esteemed program for journalists that offers a $75,000 stipend.[29] Further, on May 15, the BIA remanded Petitioners' asylum claim back to the immigration judge for consideration of new evidence and the issuance of a new decision.[30] Nevertheless, Petitioners' positive developments do not dispose of this

---

[25] Resp.'s PUF ¶¶ 27, 29.

[26] *Id.* ¶¶ 22, 28.

[27] Writ, Ex. 3 ¶¶ 1, 3.

[28] Writ at 16–20.

[29] Resp., Ex. 10 at 1, ECF No. 26.

[30] Pets.' Mot. Show Cause, Ex. A at 2, ECF No. 30-1.

cause or moot the instant motion. Thus, the Court must address Respondents' contentions that it lacks jurisdiction and that Petitioners' claims are meritless.[31]

## II. STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of fact exists when evidence is sufficient for a reasonable jury to return a verdict for the non-moving party, and a fact is material if it 'might affect the outcome of the suit.'" *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986))). In deciding whether a genuine dispute as to any material fact exists, a trial court considers all of the evidence in the record and "draw[s] all reasonable inferences in favor of the nonmoving party" but "refrain[s] from making credibility determinations or weighing the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citation and internal quotation marks omitted). Instead, the court "only 'give[s] credence to the evidence favoring the nonmovant [and] that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Orr v. Copeland*, 844 F.3d 484, 490 (5th Cir. 2016) (second alteration in original) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000)).

Procedurally, the party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014) (alterations in original) (quotation marks and citation omitted). When the nonmoving party will bear the burden of proof at trial, the

---

[31] *See* Mot. at 5–20.

moving party may satisfy this responsibility by "point[ing] out the absence of evidence supporting the nonmoving party's case." *Latimer v. Smithkline & French Labs.*, 919 F.2d 301, 303 (5th Cir. 1990); *see also Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 544–45 (5th Cir. 2005).

If the moving party succeeds, "the onus shifts to the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *LHC Grp.*, 773 F.3d at 694 (internal quotation marks and citation omitted). However, the nonmoving party "cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Davis v. Fort Bend Cty.*, 765 F.3d 480, 497 n.20 (5th Cir. 2014) (quotation marks and citation omitted).

## III.   DISCUSSION

### A.   Jurisdiction

As a threshold matter, there is a dispute regarding whether the Court has jurisdiction over this case. Respondents allege that Petitioners are attempting to challenge a discretionary decision of the Attorney General, the revocation of Petitioners' humanitarian parole. Mot. at 6–10. *See also* 8 U.S.C. § 1182(d)(5)(A) (providing the Attorney General with the discretion to grant and revoke humanitarian parole). Respondents further contend that such a challenge is barred on jurisdictional grounds by statute. Mot. at 6–10. However, Petitioners contest Respondents' characterization of the case. Petitioners counter that the Court has jurisdiction because they are merely challenging the constitutionality of their detention. Resp. at 6–9, ECF No. 27. For the following reasons, the Court holds that it has jurisdiction over all of Petitioners' claims except for their APA and Procedural Due Process claims.

At the center of this dispute over jurisdiction are the statutory provisions precluding judicial review of the Attorney General's discretionary decisions. The first such statute, 8 U.S.C. § 1226(e), states:

> The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole.

In *Demore v. Kim*, the Supreme Court interpreted Section 1226(e) as not precluding habeas review because "Section 1226(e) contains no explicit provision barring habeas review." 538 U.S. 510, 517 (2003) ("[W]here a provision precluding review is claimed to bar habeas review, the Court has required a particularly clear statement that such is Congress' intent."). However, in 2005, Congress enacted the REAL ID Act, which used exactly the sort of explicit language demanded by *Demore v. Kim* to strip district courts of jurisdiction over habeas petitions challenging the Attorney General's discretionary decisions. *See Nolos v. Mukasey*, No. EP-08-CV-287-DB, 2008 WL 5351894, at *2 (W.D. Tex. Sept. 25, 2008) ("Congress enacted the REAL ID Act on May 11, 2005, which stripped district courts of jurisdiction over 28 U.S.C. § 2241 petitions attacking removal orders."). *See also* 8 U.S.C. § 1252(B)(ii) (supplying the language needed to strip habeas jurisdiction from district courts reviewing discretionary decisions of the Attorney General).

Nevertheless, when Congress strips courts of habeas jurisdiction, it must take care not to violate the Suspension Clause. *See* U.S. Const. art. I, § 9, cl. 2 ("The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."). The Supreme Court has held that Congress stripping federal courts of habeas jurisdiction does not violate the Suspension Clause when it provides litigants with an adequate and effective substitutionary remedy. *Swain v. Pressley*, 430 U.S. 372, 381–82 (1977).

Further, "[u]nder the constitutional-avoidance canon, when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems." *Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018). Thus, courts have balked at applying the jurisdiction-stripping provision of Sections 1226(e) and 1252(B)(ii) in cases where habeas petitions assert constitutional claims challenging the extent of the Attorney General's authority, rather than his discretionary decisions. *See, e.g., id.* at 841 ("First and foremost, they are challenging the extent of the Government's detention authority under the 'statutory framework' as a whole."); *Zadvydas v. Davis*, 533 U.S. 678, 688 (2001) ("The aliens here . . . challenge the extent of the Attorney General's authority under the post-removal-period detention statute. And the extent of that authority is not a matter of discretion."); *Kambo v. Poppell*, No. SA-07-CV-800-XR, 2007 WL 3051601, at *8 (W.D. Tex. Oct. 18, 2007) ("[T]hough section 1226(e) and section 1252(a)(2)(B)(ii) preclude review of discretionary decisions or actions, they still do not preclude constitutional challenges to the legislation authorizing detention or to the extent of the Attorney General's authority under the statute.").

In the instant case, Petitioners' Substantive Due Process claim is a challenge to the constitutionality of their detention. Pets.' Brief at 13–16, ECF No. 2. The Supreme Court has already held in *Zadvydas* that such a claim is not subject to Sections 1226(e) and 1252(B)(ii). *Zadvydas*, 533 U.S. at 688. *See also Baez v. Bureau of Immigration & Customs Enf't*, 150 F. App'x 311, 312 (5th Cir. 2005) (*per curiam*) ("Section 106(a) of the [REAL ID] Act does not, however, preclude habeas review of challenges to detention that are independent of challenges to removal orders."). Thus, the Court holds that it has jurisdiction over Petitioners' Substantive Due Process claim.

However, Petitioners' Equal Protection and First Amendment claims stand on shakier grounds. On their face, these claims appear to challenge the Attorney General's discretionary decision to revoke Petitioners' humanitarian parole. *See* Pets.' Brief at 18–32. Nonetheless, appearances can be deceiving because the claims are actually challenging the extent of the Attorney General's authority. This is because the Attorney General does not have the discretion to violate the Constitution, so the Equal Protection and First Amendment claims charge the Attorney General with exceeding his lawful authority. *See Kwai Fun Wong v. United States*, 373 F.3d 952, 963 (9th Cir. 2004) ("[D]ecisions that violate the Constitution cannot be 'discretionary'"); *Myers & Myers, Inc. v. U. S. Postal Serv.*, 527 F.2d 1252, 1261 (2d Cir. 1975) ("It is, of course, a tautology that a federal official cannot have discretion to behave unconstitutionally"); *El Badrawi v. Dep't of Homeland Sec.*, 579 F. Supp. 2d 249, 270 (D. Conn. 2008) ("[S]ince ICE officials do not have discretion to violate the Constitution, a jurisdictional bar of this kind cannot preclude claims based on unconstitutional conduct by executive officials."). *See also Oyelude v. Chertoff*, 125 F. App'x 543, 546 (5th Cir. 2005) (Smith, J.) ("Section 1226(e) may strip us of jurisdiction to review judgments designated as discretionary under the pertinent language of the statute, but it does not deprive us of all authority to review statutory and constitutional challenges. We retain jurisdiction to review Oyelude's detention insofar as that detention presents constitutional issues, such as those raised in a habeas petition."). *But see Loa-Herrera v. Trominski*, 231 F.3d 984, 991 (5th Cir. 2000) (Smith, J.) ("In sum, '[t]he Attorney General's discretionary judgment regarding the application of' parole—including the *manner* in which that discretionary judgment is exercised, and whether the procedural apparatus supplied satisfies regulatory, statutory, and constitutional constraints—is 'not ... subject to review.'"). Indeed, there are similarities between Petitioners' challenge of the

extent of the Attorney General's authority in the instant case and the challenge in *Zadvydas*. In

*Zadvydas*, while the Attorney General had the discretion to determine whether or not to detain an

alien, the Supreme Court held that the Attorney General detaining an alien beyond a

constitutionally permissible period would exceed his authority. *Zadvydas*, 533 U.S. at 692 ("The

serious constitutional problem arising out of a statute that, in these circumstances, permits an

indefinite, perhaps permanent, deprivation of human liberty without any [procedural] protection

is obvious."). Here, while the Attorney General has the discretion to revoke parole, the Attorney

General doing so in a constitutionally impermissible manner would exceed his authority.

Moreover, if the Court were to interpret Sections 1226(e) and 1252(B)(ii) as barring

habeas jurisdiction with regard to Petitioners' Equal Protection and First Amendment claims, it

would implicate constitutional concerns. Since Congress has not provided an alternate and

effective substitutionary remedy as is mandated under the Suspension Clause, such an

interpretation would throw the constitutionality of the REAL ID Act into question. *See Swain*,

*supra*, 430 U.S. at 381–82. However, the Court's preferred approach successfully adheres to the

constitutional-avoidance canon and avoids implicating any concerns regarding the REAL ID

Act's constitutionality. Therefore, the Court holds that it has jurisdiction over Petitioners' Equal

Protection and First Amendment claims.

Alternatively, Petitioners' Procedural Due Process claim does not implicate the same

concerns. Petitioners charge ICE with violating their constitutional rights by not following its

internal policy, alleged to be U.S. Immigration and Customs Enforcement, ICE 11002.1, Parole

of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture (2009). Pets.' Brief

at 16–18. Petitioners allege that since they are not flight risks or dangers to the community, they

should not have had their parole revoked. *Id.* at 16. However, Respondents affirm under oath

that in exercising their discretionary authority, they weighed the factors in the policy and determined Petitioners to be flight risks because of their final order of removal. Mot., Ex. B ¶ 8. In essence, Petitioners ask the Court to review whether Respondents properly weighed the factors and determined them to be flight risks; Sections 1226(e) and 1252(B)(ii) bar exactly that sort of review. *See Hernandez v. Sessions*, 872 F.3d 976, 987–88 (9th Cir. 2017) ("A petitioner may not create the jurisdiction that Congress chose to remove simply by cloaking an abuse of discretion argument in constitutional garb." (internal quotation marks omitted)). Thus, the Court holds that it does not have jurisdiction to consider Petitioners' Procedural Due Process claim.

Similarly, Petitioners' APA claim does not implicate constitutional concerns. Thus, Sections 1226(e) and 1252(B)(ii) strip the Court of jurisdiction to hear the APA claim.[32] This is because "Section 701(a) . . . limits application of the entire APA to situations in which judicial review is not precluded by statute." *Webster v. Doe*, 486 U.S. 592, 599 (1988) (citing 5 U.S.C. § 701(a)(1)). In the instant case, judicial review is precluded by the statutes referenced above. Therefore, the Court holds that it does not have jurisdiction to consider Petitioners' APA claim. Accordingly, the Court GRANTS Respondents' Motion for Summary Judgment only with regard to Petitioners' Procedural Due Process and APA claims.

## B. Improper Respondents

Next, Respondents move to dismiss Sessions, Nielsen, Homan, and DHS on the basis that they are improper parties under *Rumsfeld v. Padilla*, 542 U.S. 426 (2004). Mot. at 5. However,

---

[32] In light of the comprehensive discussion of the *Accardi* Doctrine in *Damus v. Nielsen*, No. CV 18-578 (JEB), 2018 WL 3232515, at *12 (D.D.C. July 2, 2018), the Court notes that *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) does not save Petitioners' APA claim in this case. As the Court previously noted, ICE applied its internal policy. Thus, Petitioners' APA claim, like their Procedural Due Process claim, can be best characterized as challenging the wisdom of the Attorney General's discretionary decision. That sort of claim falls outside the bounds of the *Accardi* Doctrine.

Petitioners contest the dismissal of those four Respondents. Resp. at 13–16. For the following reasons, the Court declines to dismiss the four Respondents as improper parties.

Generally, a writ of habeas corpus "shall be directed to the person having custody of the person detained." 28 U.S.C. § 2243. Thus, the "default rule" is that the proper respondent is the party in charge of the facility where the petitioner is being detained, "not the Attorney General or some other remote supervisory official." *Padilla*, 542 U.S. at 435. Nevertheless, in *Padilla*, the Court opted not to resolve the question of whether the Attorney General is a proper respondent to a habeas petition filed by an alien detained pending deportation. *Padilla*, 542 U.S. at 435 n.8 ("In *Ahrens v. Clark*, 335 U.S. 188 (1948), we left open the question whether the Attorney General is a proper respondent to a habeas petition filed by an alien detained pending deportation . . . . Because the issue is not before us today, we again decline to resolve it."). There is currently a circuit court split on this issue, and the Fifth Circuit has not yet provided an answer. *See Nken v. Napolitano*, 607 F. Supp. 2d 149, 158 (D.D.C. 2009) (collecting cases); *Davis v. Gonzales*, 482 F. Supp. 2d 796, 799 (W.D. Tex. 2006) ("[T]he Supreme Court noted a circuit court split with respect to this very issue—a split on which the Fifth Circuit has not yet taken a position.").

Further, Respondents have not offered the Court any reason why it should dismiss the four Respondents beyond citing to *Padilla*. Mot. at 5. *Padilla* explicitly declined to decide this precise issue. 542 U.S. at 435 n.8. The parties were likewise unable to offer a Fifth Circuit case addressing this precise issue. Respondents, as movants, have failed to carry their burden of proving that dismissal is proper. Therefore, the Court declines to dismiss the four Respondents at this time. Accordingly, the Court DENIES Respondents' Motion to Dismiss Sessions, Nielsen, Homan, and DHS as improper party respondents.

## C. Constitutional Claims

After resolving the jurisdictional issues in this matter, Petitioners' remaining claims are their Substantive Due Process, Equal Protection, Freedom of the Press, and Freedom of Speech claims. Respondents advance two main arguments in opposition to these claims: 1) they are meritless, and 2) they have the authority to detain Petitioners. Mot. at 12–18. For the following reasons, the Court grants Respondents' Motion with respect to Petitioners' Substantive Due Process and Equal Protection claims and denies Respondents' Motion with regard to Petitioners' Freedom of the Press and Freedom of Speech claims.

### 1. Substantive Due Process Claim

Petitioners assert that Respondents are violating their due process rights under the Fifth Amendment to the United States Constitution by detaining them without justification. Resp. at 17–19; Pets.' Brief at 13–16. "It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." *Reno v. Flores*, 507 U.S. 292, 306 (1993). "Substantive due process analysis must begin with a careful description of the asserted right." *Reno v. Flores*, 507 U.S. 292, 302 (1993) (internal quotation marks omitted). "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas*, 533 U.S. at 690. Thus, the Court must determine whether the regulatory framework authorizes Petitioners' detention and if said regulatory framework meets constitutional muster as applied to the instant case.

The Attorney General's authority to detain and release aliens derives from 8 U.S.C. § 1182(d)(5)(A) and 8 U.S.C. §§ 1226(a)–(b). Sections 1182(d)(5)(A) and 1226(a)(2)(B) provide mechanisms whereby the Attorney General, in his discretion, may grant an alien parole. 8 U.S.C. § 1182(d)(5)(A) ("The Attorney General may . . . in his discretion parole into the United

States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States . . ."); 8 U.S.C. § 1226(a)(2)(B) ("On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) and pending such decision, the Attorney General may release the alien on conditional parole"). However, Sections 1182(d)(5)(A) and 1226(b) also allow the Attorney General to revoke said parole and detain the alien. 8 U.S.C. § 1182(d)(5)(A) (". . . but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States."); 8 U.S.C. § 1226(b) ("The Attorney General at any time may revoke a bond or parole authorized under subsection (a), rearrest the alien under the original warrant, and detain the alien."). Moreover, the Supreme Court "has recognized detention during deportation proceedings as a constitutionally valid aspect of the deportation process." *Demore*, 538 U.S. at 523. This is because "deportation proceedings 'would be vain if those accused could not be held in custody pending the inquiry into their true character.'" *Id.* (quoting *Wong Wing v. United States*, 163 U.S. 228, 235 (1896)). Thus, detention during deportation proceedings is not unconstitutional on its face.

Petitioners advance a fairly novel argument that Respondents allowing them to live, work, and establish roots in America for nearly a decade while on parole has given them a due process right to not be snatched off the street without warning whenever Respondents see fit. Resp. at 17–19. Further, Petitioners contend that Respondents have failed to provide adequate

reasoning for their detention. *Id.* To address Petitioners' first argument, the Court cannot agree

that Respondents' grace of allowing them to remain on parole for nearly a decade has created a

due process right. It was a discretionary decision for Respondents to grant them parole, and

Respondents had the authority to revoke that parole. *See, e.g.*, 8 U.S.C. § 1182(d)(5)(A).

Further, the Supreme Court has recognized the use of detention during deportation proceedings

as constitutionally valid. *See Demore, supra*, 538 U.S. at 523. With regard to Petitioners'

second argument, the Court noted above that it does not have the jurisdiction to inquire into

whether Respondents properly weighed the factors according to their internal policies in

determining whether Petitioners should remain out on parole. *See Hernandez, supra*, 872 F.3d at

987–88. However, the Court earlier concluded that Respondents, at minimum, applied their

internal policies and provided an adequate reason for revoking Petitioners' parole. *See, supra*,

Mot., Ex. B ¶ 8. Therefore, Petitioners have failed to raise a violation of their due process

rights.[33] Accordingly, the Court GRANTS Respondents' Motion for Summary Judgment with

respect to Petitioners' Substantive Due Process claim.

## 2. *Equal Protection Claim*

Petitioners allege that Respondents discriminated against them on the basis of their

national origin in violation of the Equal Protection Clause under the Fifth and Fourteenth

Amendments to the United States Constitution. Pets.' Brief at 18–25. Respondents contend that

summary judgment is warranted because Petitioners have failed to provide evidence of

discriminatory purpose. Mot. at 12–13. Petitioners counter that they have provided evidence of

---

[33] It does not appear that Petitioners attempt to challenge their detention as unconstitutional under *Zadvydas*. 533 U.S. at 701 ("We do have reason to believe, however, that Congress previously doubted the constitutionality of detention for more than six months."). Nevertheless, even if Petitioners did intend to challenge the length of their detention under *Zadvydas*, their challenge is premature because they filed suit after being detained for only three months. *See Akinwale v. Ashcroft*, 287 F.3d 1050, 1051–52 (11th Cir. 2002) ("This six-month period thus must have expired at the time Akinwale's § 2241 petition was filed in order to state a claim under *Zadvydas*.").

discriminatory purpose in the form of President Trump's statements, changes in DHS policy, and emails between members of the El Paso ICE Office. Resp. at 21–27.

The Equal Protection Clause "directs states to treat 'all persons similarly situated' alike." *Vera v. Tue*, 73 F.3d 604, 609–10 (5th Cir. 1996) (quoting *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 439 (1985)). The equal protection guarantees of the Fourteenth Amendment are also applicable to the federal government through the Fifth Amendment's Due Process Clause. *See, e.g., Washington v. Davis*, 426 U.S. 229, 239 (1976) ("The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race. It is also true that the Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups."). In order to establish a valid Equal Protection claim, a party must show more than a disproportionate impact. *United States v. Galloway*, 951 F.2d 64, 65 (5th Cir. 1992). "Even if a neutral law has a disproportionately adverse effect upon [persons of a certain national origin], it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose." *Id.* (quoting *Personnel Adm'r v. Feeney,* 442 U.S. 256, 272 (1979) (internal quotation marks omitted)). Thus, "[d]iscriminatory purpose in an equal protection context implies that the decisionmaker selected a particular course of action at least in part because of, and not simply in spite of, the adverse impact it would have on an identifiable group." *Woods v. Edwards*, 51 F.3d 577, 580 (5th Cir. 1995) (*per curiam*) (internal quotation marks omitted). "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

In the instant case, Petitioners first ask the Court to consider President Trump's statements about Mexicans as evidence of his administration's discriminatory animus towards Petitioners. Resp. at 22–24. Petitioners cite *Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233 (4th Cir. 2018) (hereinafter "*IRAP*") as support for their argument that the Court can consider President Trump's statements made both while campaigning and in office. *Id.* at 26. In *IRAP*, the Fourth Circuit considered President Trump's statements regarding his planned "Muslim ban" in evaluating whether his executive order violated the First Amendment. 883 F.3d at 263. The court determined that it could consider President Trump's statements and held that those statements revealed a constitutionally impermissible purpose behind the executive order at issue. *Id.* at 264 ("The President's own words—publicly stating a constitutionally impermissible reason for the Proclamation—distinguish this case from those in which courts have found that the Government had satisfied *Mandel*'s 'bona fide' prong."). However, *IRAP* is distinguishable from the instant case. In *IRAP*, President Trump made statements referring to a "Muslim ban" and then executed policies that were similar to the "Muslim ban" he discussed. *Id.* Here, the statements that Petitioners offer only show President Trump's criticisms of Mexicans; they do not include any statements from President Trump promising to revoke the parole of all Mexicans in the United States. *See* Pets.' Brief at 21–22; Resp. at 24. With that all said, out of an abundance of caution, the Court will adopt the Supreme Court's approach from *Trump v. Hawaii*, No. 17-965, 2018 WL 3116337 (U.S. June 26, 2018). In reviewing the same issue from *IRAP*, the plaintiffs asked the Supreme Court "to probe the sincerity of the stated justifications for the policy by reference to extrinsic statements—many of which were made before the President took the oath of office." *Trump v. Hawaii*, No. 17-965, 2018 WL 3116337, at *20 (U.S. June 26, 2018). In describing how it would consider such a challenge, the Court explained:

For our purposes today, we assume that we may look behind the face of the Proclamation to the extent of applying rational basis review. That standard of review considers whether the entry policy is plausibly related to the Government's stated objective to protect the country and improve vetting processes. As a result, we may consider plaintiffs' extrinsic evidence, but will uphold the policy so long as it can reasonably be understood to result from a justification independent of unconstitutional grounds.

*Trump v. Hawaii*, No. 17-965, 2018 WL 3116337, at *21 (U.S. June 26, 2018) (internal citation omitted). Here, the Court considered Petitioners' extrinsic evidence, but it upholds Respondents' revocation of parole because it could be reasonably understood to result from a justification independent of unconstitutional grounds. This is because Petitioners' extrinsic evidence, President Trump's statements, lack anything more than a tenuous connection to Respondents' actions.[34] Conversely, Respondents' justification for revoking parole is rationally related to the legitimate government interest of ensuring that Petitioners are able to be located if there is an adverse ruling on their asylum claim. *See, supra*, Mot., Ex. B ¶ 8 ("I considered [Petitioners] a

---

[34] Moreover, the Court is uneasy about giving significant weight to statements from a public official made while he was a candidate when evaluating his policies after he has taken office. The Court agrees with Judge Alex Kozinski's reasoned analysis of this issue:

> Candidates say many things on the campaign trail; they are often contradictory or inflammatory. No shortage of dark purpose can be found by sifting through the daily promises of a drowning candidate, when in truth the poor shlub's only intention is to get elected. No Supreme Court case—indeed no case anywhere that I am aware of—sweeps so widely in probing politicians for unconstitutional motives. And why stop with the campaign? Personal histories, public and private, can become a scavenger hunt for statements that a clever lawyer can characterize as proof of a -phobia or an -ism, with the prefix depending on the constitutional challenge of the day.
>
> This path is strewn with danger. It will chill campaign speech, despite the fact that our most basic free speech principles have their "fullest and most urgent application precisely to the conduct of campaigns for political office." *McCutcheon* v. *Fed. Election Comm'n*, 134 S.Ct. 1434, 1441 (2014) (citation and internal quotation marks omitted). And it will mire us in a swamp of unworkable litigation. Eager research assistants can discover much in the archives, and those findings will be dumped on us with no sense of how to weigh them. Does a Meet the Press interview cancel out an appearance on Face the Nation? Does a year-old presidential proclamation equal three recent statements from the cabinet? What is the appropriate place of an overzealous senior thesis or a poorly selected yearbook quote?

*Washington v. Trump*, 858 F.3d 1168, 1173–74 (9th Cir. 2017) (Kozinski, J., dissenting).

flight risk because they had a final order of removal."). *See also Demore*, 538 U.S. at 523 (recognizing detention as a constitutionally valid aspect of the deportation process).

Petitioners next contend that DHS's changes to its policies and the emails between members of the El Paso ICE Office prove that Respondents were discriminating against Petitioners on the basis of their national origin when they revoked their parole. Pets.' Brief at 22–23; Resp. at 22–24. However, the changes in policy only show evidence of a harsher and more aggressive approach to immigration when compared to President Obama. This is not surprising because President Trump campaigned on enhanced border security and harsher and more aggressive enforcement of our nation's immigration laws, as Petitioners' statements from President Trump show. Pets.' Brief at 21–22. Significantly, while President Trump has taken steps to "secure the border" and target unauthorized aliens living in the United States, Petitioners have not offered evidence that he is targeting Mexicans specifically. For example, while "securing the border" has an adverse impact on Mexican immigrants, it also affects other immigrants coming from other nations in Central and South America. Further, the Court is reluctant to read discriminatory animus into an administration's discretionary decisions based solely upon the president attempting to enact an agenda at the center of his campaign. Petitioners lack a strong enough connection between President Trump's tough-on-immigration agenda and the revocation of their parole necessary for the Court to infer discrimination.

Finally, with respect to the emails between ICE officials, Petitioners again lack the necessary link for the Court to infer discriminatory intent. The emails reveal that ICE was targeting Petitioners before their asylum case was denied, but they do not show that Petitioners were being targeted because of their national origin. *See* Resp., Ex. 6, ECF No. 26. Without that link, the emails simply are not strong enough evidence to create a genuine issue of material fact

as to whether Respondents violated Petitioners' equal protection rights. Accordingly, the Court GRANTS Respondents' Motion for Summary Judgment with regard to Petitioners' Equal Protection claim.

### 3. First Amendment Claims

Petitioners allege that Respondents infringed upon their free press and free speech rights in violation of the First Amendment to the United States Constitution. Pets.' Brief at 25–31; Resp. at 27–32. *See also* U.S. Const. amend. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or *abridging the freedom of speech, or of the press*; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." (emphasis added)).[35] By their Motion, Respondents provide two bases for why summary judgment is proper: 1) Petitioners have failed to adequately show but-for causation,[36] and 2) Respondents had a constitutionally valid reason for revoking Petitioners' parole. Mot. at 14–16. The Court will first address Petitioners' Freedom of the Press claim before turning to their Freedom of Speech claim.

#### (a) Freedom of the Press Claim

"Freedom of the press is a fundamental personal right which is not confined to newspapers and periodicals." *Branzburg v. Hayes*, 408 U.S. 665, 704 (1972) (internal quotation marks omitted). "It is the purpose of the First Amendment to preserve an uninhibited

---

[35] The Supreme Court has held that aliens residing in the country are entitled to the protections of the First Amendment. *See, e.g., United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) (collecting cases regarding the constitutional rights of aliens); *Bridges v. Wixon*, 326 U.S. 135, 148 (1945) ("Freedom of speech and of press is accorded aliens residing in this country.").

[36] The parties dispute whether Petitioners must prove but-for causation. *Compare* Mot. at 14–15 (citing to cases analyzing § 1983 claims in support of the proposition that Petitioners must prove but-for causation), *with* Resp. at 32 (arguing that a party does not have to prove but-for causation when challenging government action in the habeas context). Because Petitioners' First Amendment claims would survive summary judgment even if the Court required them to prove but-for causation, the Court declines to resolve this issue today.

marketplace of ideas in which truth will ultimately prevail, rather than to countenance monopolization of that market, whether it be by the Government itself or a private licensee." *Red Lion Broad. Co. v. F.C.C.*, 395 U.S. 367, 390 (1969). Thus, one of the major purposes of the First Amendment is to protect the free discussion of governmental affairs. *Mills v. State of Ala.*, 384 U.S. 214, 218 (1966). "This of course includes discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes. The Constitution specifically selected the press . . . to play an important role in the discussion of public affairs." *Id.* at 218–19. Consequently, the press serves "as a powerful antidote to any abuses of power by governmental officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve." *Id.* at 219. "Suppression of the right of the press to praise or criticize governmental agents and to clamor and contend for or against change . . . muzzles one of the very agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free." *Id.* Therefore, the First Amendment "must be taken as a command of the broadest scope that explicit language, read in the context of a liberty-loving society, will allow." *Bridges v. State of Cal.*, 314 U.S. 252, 263 (1941).

The foundation of Petitioners' Freedom of the Press claim is built upon the emails between ICE officials, the temporal proximity between Mr. Gutierrez-Soto's criticism of ICE and the revocation of Petitioners' parole, and the comments from an ICE official directed at Bill McCarren. Pets.' Brief at 26–28; Resp. at 27–29. Respondents contend that they detained Petitioners based on a warrant issued after the removal order issued by the immigration judge became final in August 2017. Mot. at 15–16. However, the emails between ICE officials

undermine Respondents' argument. The emails show that ICE officials were already targeting Mr. Gutierrez-Soto in February 2017. Resp., Ex. 6 (including Mr. Gutierrez-Soto on a list as a "candidate for arrest" in an email string titled "Non-Detained Target List"). This is significant because it is before the immigration judge issued the removal order in July 2017, which became final in August 2017. *See* Mot. at 15. Moreover, Mr. Gutierrez-Soto criticized ICE and the government in a very public manner while accepting a prestigious award from the National Press Club. Pets.' Brief at 28 (accusing United States immigration authorities of "bartering away international law" with regard to asylum seekers). His arrest occurred only a couple months later. Finally, William McCarren, the Executive Director of the National Press Club, affirms under oath that an ICE official told him to "tone it down" during a meeting regarding Mr. Gutierrez-Soto, and he interpreted the comment in the context of the conversation to mean that the media should stop attracting attention to Petitioners' cause. Writ, Ex. 47 ¶ 15, ECF No. 1-10.

Taking all of this evidence into account, Petitioners have offered enough evidence to create a genuine issue of material fact regarding whether Respondents violated their First Amendment rights. Petitioners have offered evidence that allows for an inference that they were targeted before their asylum case was denied and ICE officials did not approve of the negative press that Petitioners were generating. Drawing these inferences in favor of Petitioners, the nonmoving party, there is support for Petitioners' claim that Respondents retaliated against them for asserting their free press rights. This is also sufficient evidence for the trier of fact, drawing all reasonable inferences in favor of Petitioners, to conclude that Respondents' reason for detaining Petitioners is a pretext. Accordingly, the Court DENIES Respondents' Motion for Summary Judgment with respect to Petitioners' Freedom of the Press claim.

### (b) Freedom of Speech Claim

"[T]he First Amendment reflects a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and [we] have consistently commented on the central importance of protecting speech on public issues." *Boos v. Barry*, 485 U.S. 312, 318 (1988) (internal quotation marks and citation omitted). Pure political speech is entitled to the highest First Amendment protection. *Tauber v. Town of Longmeadow*, 695 F. Supp. 1358, 1360 (D. Mass. 1988). While pure political speech can be subject to reasonable time, place, and manner restrictions, the restrictions must be content-neutral, serve a significant government interest, and leave open ample alternative channels for communication of the information. *Id.* Thus, when the government seeks to restrict speech, it must not base its decision to do so on the content of the speech. *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 516 (1981) ("We have observed that . . . restrictions are permissible if they are justified without reference to the content of the regulated speech . . . ." (internal quotation marks omitted)). "Above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Department of Chicago v. Mosley,* 408 U.S. 92, 95 (1972).

Petitioners allege that Respondents revoked their parole as retaliation for Mr. Gutierrez-Soto's comments criticizing United States immigration policy. Pets.' Brief at 29–32; Resp. at 30–32. Petitioners point to the temporal proximity between Mr. Gutierrez-Soto's criticism of the country's immigration policy and the revocation of Petitioners' parole, similar actions against other immigration activists who have spoken out, and the comments from an ICE official directed at Bill McCarren for support. *Id.* The Court previously discussed the significance of the temporal proximity between Mr. Gutierrez-Soto's criticism and the revocation of his parole as well as the comment from the ICE official directed at Bill McCarren. *See, supra*, Pets.' Brief at

28 (accusing United States immigration authorities of "bartering away international law" with regard to asylum seekers); Writ, Ex. 47 ¶ 15 (declaring under oath that an ICE official told him to "tone it down" in reference to press coverage of Petitioners' detention). Further bolstering Petitioners' case is evidence of Respondents' alleged pattern of conduct. Petitioners list five other vocal activists who, like Mr. Gutierrez-Soto, were allegedly targeted between December 2017 and January 2018 by ICE. Resp. at 30–31. Drawing all reasonable inferences in favor of Petitioners, the evidence could establish that Respondents retaliated against immigrant activists who criticized the government's policies. For example, the ICE official's comment towards Bill McCarren could be taken as evidence that ICE disapproves of negative publicity. When that is taken in conjunction with ICE's alleged pattern of targeting other immigration activists after they spoke out and Mr. Gutierrez-Soto being detained shortly after he spoke out, there is enough evidence to create a genuine issue of material fact regarding whether Respondents retaliated against Petitioners for Mr. Gutierrez-Soto's comments. If Respondents did retaliate against Petitioners for that reason, they restricted Petitioners' free speech rights because of the content and message of Mr. Gutierrez-Soto's political speech. *See, supra, Mosley,* 408 U.S. at 95 ("Above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."). Accordingly, the Court DENIES Respondents' Motion for Summary Judgment with respect to Petitioners' Freedom of Speech claim.

## IV.   CONCLUSION

Accordingly, **IT IS ORDERED** that Respondents' "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" (ECF No. 22) is **GRANTED IN PART AND DENIED IN PART**. The Court **GRANTS** the Motion with respect to Petitioners' Procedural

Due Process, Substantive Due Process, Equal Protection, and APA claims, which are hereby **DISMISSED WITH PREJUDICE**. The Court **DENIES** the Motion with regard to Petitioners' Freedom of the Press and Freedom of Speech claims.

**So ORDERED and SIGNED this** _10th_ **day of July 2018.**

DAVID C. GUADERRAMA
UNITED STATES DISTRICT JUDGE